Law Office of Jeffrey L. Needle
119 First Avenue S Suite 200
Seattle, Washington 98104
Telephone: (206) 447-1560
Fax: (206) 447-1523
Attorney for Plaintiff

The Honorable Thomas O. Rice

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

|  |  |
|---|---|
| ALBERT OLE PETERSON,<br><br>                    Plaintiff,<br><br>v.<br><br>NATIONAL SECURITY<br>TECHNOLOGIES,<br>a Delaware corporation,<br><br>                    Defendant. | )<br>)<br>)<br>)     No.  CV-12-5025-TOR<br>)<br>)   PLAINTIFF'S STATEMENT OF<br>)   MATERIAL FACTS IN<br>)   SUPPORT OF MOTION<br>)   FOR SUMMARY JUDGMENT<br>)<br>)    NOTED FOR:<br>)   APRIL 19, 2013, 1:30 P.M.<br>) |

## A. The Cast of Characters.

1. **Ole Peterson** began working for NSTech in January, 2007 as a casual employee as an instructor for counter terrorism operation support. He trained first responders to response to a weapon of mass destruction radiological nuclear event. He was

STATEMENT OF MATERIAL FACTS - 1

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington  98104
(206) 447-1560 fax (206) 447-1523

converted to a regular employee in January, 2008 as a Course Director - his technical job title was Senior Operations Specialist. Ex. A, p.7, Peterson Dep., 13:10-15:1. Mr. Peterson resigned from employment in lieu of termination on November 16, 2011. Ex. A, p.7, Peterson dep., 15:7-9.

2. **Randall Whitt**, at all relevant times, was employed as a Western Regional Manager for Counter Terrorism Operations Support (CTOS), a division of Nstech. Ex. B, p. 13, Whitt Dep., 4:12-5:2. Mr. Whitt was Mr. Peterson's direct supervisor. Ex. B, p. 15, Whitt dep., 20:24-25. Mr. Whitt directly reported to **Bruce Chisholm,** the Operations Manager, who in return reported to **Dennis Dugan**, the Program Manager. Ex. B, p. 15, Whitt Dep., 18:1-11.

3. **Fannie Bell**, at all relevant times, was employed by the Defendant as a senior workforce specialist. Ex. C, p.25, Bell dep., 5:14-22. At all relevant times, **Pamela Haynes** was employed by the Defendant as a senior workforce specialist. Ex. J, Haynes dep., p.129, 5:7-20. At all relevant times, **Wes Young** was employed by the Defendant as the employee relations/labor relations division manager, Ex. D, p,.46, Young, 5:7-19, and supervised both Ms. Bell and Ms. Haynes. Ex. D, p. 48, Young, 19:11-15. At all relevant times, **Kenneth Andriessen** was employed by the Defendant as Director of Enterprise Resources. Ex. E, p. 62, Andriessen, 5:7-18. Andriessen had supervisory responsibility over Mr. Young, Ms. Bell and Ms. Haynes.

STATEMENT OF MATERIAL FACTS - 2

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

Ex. D, p. 48, Young, 20:13-18.

4. **Frank Christian** was employed by NSTech, and works on the project team. Ex. F, Christian, p. 73, 4:15-5:1. Mr. Christian is African American.

5. **Rick Folle** was employed by the Defendant as a Course Director. Ex. B, p. 15, Whitt Dep., 21:8-10. He resigned from employment in lieu of termination on September 22, 2011. Ex. K, p. 133, Folle termination letter.

6. **Mario Guerrero** was employed as an Instructor for NSTech. Ex. G, Guerrero, p. 87, 5:16-21. Since January, 2012, Mr. Guerrero received an effective promotion - "To the course director position whenever I have been called." Guerrero acted as a course director more often since after Peterson left, and is making more money. Ex. G, p. 89, Guerrero, 44:5-46:8.

7. **Curt Wargo** is a former Course Director with NSTech. Ex. C, p. 34, Bell dep., 70:8-14.

8. **Harry Platte** was a Course Director at the time of Folle's termination from employment. Ex. B, p.17, Whitt, 31:20-23.

9. **Jay Dickerman** is the manager for Internal Audit. He is responsible for managing and supervising all of the audits, and supervises a staff of four auditors and one support person. He is the only one that does the audits. Ex. H, p. 103, Dickerman, 23:3-23.

STATEMENT OF MATERIAL FACTS - 3

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

**B. Numerous Complaints About Rick Folle - Background.**

10.  There were numerous complaints about the behavior of Mr. Folle from a variety of sources.  Mr. Christian made at least two racial discrimination complaints to Ms. Bell about Mr. Folle.  Ex. F, p. 74-75, Christian, 13:17-14:17.  Christian also told Ms. Bell about racial, gender and gay related jokes and comments told by Folle, *Id.* at p. 77, 32:9-25, and had additional complaints about Folle unrelated to discrimination. *Id.* at p. 75, 14:18-21.  According to Chisholm, Christian raised safety complaints about Folle.  Ex. I, p. 118A, Chisholm, Vol. I, 49:2-12.

11.  According to Mr. Whitt, he heard many complaints about Folle, primarily but not exclusively from Mr. Peterson.  Ex. B, p. 20, Whitt Dep., 58:13-59:5.  Several months before Folle resigned, Whitt counseled Folle about his temper.  According to Whitt, the counseling did not rise to the level of discipline.  Ex. B, p. 18,  Whitt, 35:8-36:14.

12.  According to Mr. Peterson, he reported to Mr. Whitt complaints about Folle's temper, anger issues, driving erratically, and making inappropriate comments all the time - "political, racial - the whole gamut."  Ex. A, p. 8,Peterson., 49:20-50:10. According to Mr. Peterson, "everybody complained about Folle at times, and nothing seemed to change."  Ex. A, p. 8,  Peterson dep., 50:17-52:18.

13.  Ms. Bell acknowledges that Folle "has been involved in several investigations

STATEMENT OF MATERIAL FACTS - 4

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington  98104
(206) 447-1560 fax (206) 447-1523

by Employee Resources where Christian has alleged discrimination by Folle." Ex. Q, p. 170.    Nevertheless, Ms. Bell acknowledges that she never did any investigations concerning the racial allegations about Mr. Folle. Ex. C, pp. 27-28, Bell, 42:18-43:6; 48:8-49:3.  She sent racial complaints about Folle to Christian's management.  Ex. C, pp. 27-28, Bell, 44:25-46:8.

14. Until the time of Mr. Folle's forced resignation from employment, no disciplinary action of any kind had been taken against Mr. Folle.  Ex. C, p. 29, Bell, 50:8-11; Ex. I, p. 118B, Chisholm, Vol. I, 50:17-21; Ex. B, p. 18, Whitt dep, 35:25-36:23.

**C. Folle Sends a Racist Email to Guerrero.**

15.  On or about the September 20, 2011, Mario Guerrero received from Rick Folle an email which depicted First Lady, Michelle Obama, as Cheetah the Monkey from the story of Tarzan (hereinafter racist email).  Ex. G, p. 95, Guerrero, 69:9-19;  Ex. L, p. 135.

16. NSTech policy prohibits discrimination on the basis of race, color, religion, sex, age, national origin, disability, or covered veterans status, and requires compliance with all state and federal anti-discrimination law.  Exhibit R, pp. 189-192, Section 4.1.2.1.1 - 4.1.2.1.2.  In reference to all employees NSTech policy provides: "if prohibited conduct is observed or experienced, then immediately report such conduct to supervision or ER."  *Id.*, at Section 4.1.2.2(1).  In reference to supervisors: "if

STATEMENT OF MATERIAL FACTS - 5

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

prohibited conduct is observed or experienced, then immediately report such conduct to ER immediately." *Id.*, at Section 4.1.2.3(1). A "note" to the policy provides: "A supervisor's failure to report prohibited conduct immediately may result in discipline up to and including termination." *Id.* NSTech policy is virtually identical concerning harassment and reporting harassment. Ex. R - Ex. 12, p. 193, at section 4.15.

17. It is not disputed that the distribution of this racist email was a violation of NSTech policy, and all employees had an obligation to report it. Ex. C, p. 35, Bell, 78:-79:1; Ex. B, p. 16, Whitt dep., 27:9-19; Ex. E, p. 64, Andriessen, 27:13-28:18. Ex. D, p. 49, p. 50, Young dep., 28:13-29:14, 87:16-89:19.

18. Mr. Peterson and Curt Wargo were present when Guerrero opened the email. Immediately after opening the racist email from Mr. Folle, Mr. Guerrero said "oh, my goodness." Peterson and Wargo were standing behind him and they looked over his shoulder to observe the email. Ex. G, p. 97, Guerrero, 75:15-76:7.

19. There was general disbelief that Folle had sent the email - "I can't believe that he sent it." Ex. G, p. 97, Guerrero, 76:11-24. It was agreed by all that this type of email was prohibited by company policy and that Mr. Folle could get in trouble for having sent it. *Id.* at p. 97, 76:20-24.

20. Mr. Peterson reasonably believed that the email sent by Folle to Guerrero on September 20, 2011 was a violation of state and federal law. Peterson Declaration,

STATEMENT OF MATERIAL FACTS - 6

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

para 4.

21. Mr. Peterson's purpose in reporting the email was to stop the prohibited conduct. An interest to secure his continued employment played no part in his motivation. Peterson Declaration, para 7.

22. Randall Whitt was not offended by the email despite the fact that he thought it was racist. Ex. B, p. 16, Whitt dep., 27:2-8.

23. Mr. Guerrero he was not offended by the email despite the fact that he thought it was racist. Ex. G, p. 96, Guerrero, 71:21-72:18.

**D. Peterson Gives the Racist Email to Christian to Stop the Prohibited Conduct.**

24. Shortly after becoming aware of the racist email, Mr. Peterson told Frank Christian, who is African American, about the email. According to Christian, Peterson told him that he saw a Tarzan email that really made him feel uncomfortable - "something is wrong with this and this kind of behavior needs to stop because it's not right, it's wrong . . . ." Ex. F, p. 78-79, Christian, 44:19-46:17; -Ex. N, p. 147-148.

25. Mr. Christian understood that Peterson had told him about the email because he wanted that conduct to stop. Ex. F, p. 79, Christian, 48:12-23.

26. Peterson told Christian that he didn't go to management because he thought they

STATEMENT OF MATERIAL FACTS - 7

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

would sweep it under the rug; he didn't trust Whitt or Dugan. Ex. F, p. 83, Christian, 65:1-12. Mr. Christian repeated that testimony during his interview with Ms. Bell, which is reflected in her interview notes. Ex. C, p. 37, Bell, 90:1-17; Ex. N , p. 148.

27. During his deposition, Peterson testified that he didn't go to management or HR because there had been numerous complaints about Folle in the past and no action was ever taken. Ex. A, p. 8, Peterson, 49:8-23.

28. Because of the nature of email, and the fact that Mr. Christian was African American, Mr. Peterson believed that the report of the email by Mr. Christian would carry greater weight than if he reported it directly. Ex. A, p. 9, Peterson, 53:22-54:10.

**E. Christian Reports the Email to Human Resources.**

29. As anticipated, Mr. Christian did report the email to Fanny Bell, senior workforce specialist, and explained to her the details of the email, and eventually told Bell that Peterson had given him the email. Bell asked Christian if he could get a copy of the email. Ex. F, p. 79, Christian, 47:12-49:7.

30. Mr. Christian then told Mr. Peterson that a copy of the email was required by Human Resources. Ex. F, p. 79, Christian, 49:8-11

31. After learning that a copy of the racist email was required, Mr. Peterson went back to Mr. Guerrero to obtain a copy of the email. Ex. A, Peterson, p. 9, 55:14-56:1. Peterson asserts that Guerrero gave him a copy of the email. He denies that he

STATEMENT OF MATERIAL FACTS - 8

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

printed the email as claimed by Guerrero, and denies knowledge of it being deleted. *Id.* at p. 9, 56:1-14.

32.   According to Guerrero, however, he deleted the email.  Despite Peterson's request, Guerrero refused to retrieve it or print it.  According to Guerrero, Peterson was nevertheless able to recover the email and print it without Guerrero's assistance. Ex. G, p. 99, Guerrero, 82:12-83:16.

33.  After retrieving the email, Mr. Peterson gave a copy to Frank Christian, who then gave it to Mr. Bell, at Human Resources.  Ex. F, p. 80, Christian, 50:21-25.

34.  At the time Ms. Bell received the a copy of the email from Mr. Christian on September 22, 2011, she was aware that Mr. Christian obtained a copy of the email from Mr. Peterson, a course director.  Ex. F, p. 81- 82, Christian, 53:5-54:8; Ex. C, p. 31, Bell, 59:12-60:10; Ex. Q, p. 170.

35.  Mr. Christian told Ms. Bell that Peterson gave him the email because he was upset about it and knew that Christian would do something with it.  Ex. C, p. 31, Bell Dep. 60:11-19; Ex. N, p. 148.

**F.  Folle Offered a Chance to Resign Because of the Email.**

36.  Upon receipt of the racist email at Human Resources, Ms. Bell met with Kenneth Andriessen.  The follow-up investigation was assigned to Pamela Haynes. Ex. C, p. 30, Bell, 54:18-57:14.

STATEMENT OF MATERIAL FACTS - 9

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

37.  After meeting with Ms. Bell, Mr. Andriessen met with Dr. Younger, the President of NSTech. Thereafter Ms. Haynes was told that she and Mr. Dugan would meet with Folle and offer him an opportunity to resign from the company or be placed on administrative leave without pay pending an investigation.  But that never happened and Haynes has no knowledge of who spoke with Folle to give him a chance to resign. Ex. J, p. 130, Haynes, 42:23-45:7; Ex. Q - Exhibit 10.

38.  In furtherance of the investigation by Ms. Haynes, neither Mr. Guerrero, Mr. Peterson, nor Mr. Wargo was interviewed.  Ex. J, Haynes, 45:9-13; Ex. Q, p. 170.

39.  On September 26, 2011, Mr. Folle resigned from NSTech in lieu of termination from employment because of racist email that he sent to Mr. Guerrero. Ex. C, p. 29, Bell, 51:4-9; Ex. I, p. 118, Chisholm Vol. I, 24:14-16; Ex. K, termination letter.

## G.  Guerrero Complains to Chisholm About Peterson a Month Later.

40.  On or about the October 20, 2011, Mr. Guerrero met with Bruce Chisholm. During this meeting, Mr. Guerrero told Mr. Chisholm of his concern that Mr. Peterson reported the racist email with the ulterior motive to get Mr. Folle terminated from employment so that Mr. Peterson's job would be more secure. He also told Mr. Chisholm that Mr. Peterson had been "costing the company money" by leaving training sessions early and billing the company as if he were in attendance.  Mr. Chisholm memorialized this conversation with Mr. Guerrero in an email and sent it

STATEMENT OF MATERIAL FACTS - 10

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington  98104
(206) 447-1560 fax (206) 447-1523

to Fanny Bell at her request.  Ex.C, p. 32-33, Bell, 64:19-67:10; Ex. I, p. 121, Chisholm , Vol I, 67:9-68:7. Ex. M, p. 142.

41. After the September investigation concerning the email was re-assigned from Mr. Bell to Ms. Haynes, Ms. Bell heard nothing more about the racist email until Bruce Chisholm called her on or about October 24, 2011, and told her about his conversation with Guerrero ,which he memorialized in an email.  Ex. C, p. 32-33, Bell, 64:19-67:14; Ex. M.

**H. Bell Conducts An Investigation About Peterson.**

42.   After receiving the email from Mr. Chisholm, Ms. Bell conducted an investigation to determine whether Mr. Peterson reported the racist email with the ulterior motive to make his employment more secure by getting Mr. Folle terminated from employment.  Ex. C, p. 33-34, Bell, 69:1-70:2.

43. The allegation of misconduct concerning fraud, waste and abuse (leaving training sessions early and getting paid for expenses not incurred) was assigned to Jay Dickerman for an internal audit.  Ex. C, p. 37, Bell, 91:5-92:4; Ex. H, p. 104 -105, Dickerman, 29:16-31:6.

44. In the furtherance of her investigation, Ms. Bell interviewed Guerrero, Christian, Peterson and Platte.  Ex. C, p. 33, Bell, 69:1-70:2.  Platte was interviewed in reference to the fraud waste and abuse allegation. Ex. C, Bell, p. 38, 99:23-100:24.

STATEMENT OF MATERIAL FACTS - 11

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

45.  Generally, on October 31, 2011, Guerrero told Bell about how the racist email was received and opened in the presence of Peterson and Curt Wargo.  He told her that he deleted it from his computer.  That later Peterson asked him for a copy, and that he refused to either forward the copy or print it.  Guerrero told Bell that Peterson printed the email, and said that "he (Folle) can really get in trouble." Ex. N , p. 145.

46.  Guerrero told Bell that Peterson had been making statements after Folle was terminated that because he was the only remaining Course Director on the road, they are going to have to keep me.  Guerrero stated that Peterson's true agenda for requesting the email was to get rid of the competition, Folle.  The substance of the interview with Guerrero are reflected in Bell's interview notes.  Ex. N, p. 146.

47.  Guerrero also told Bell, during that same interview, that Peterson is costing the company money, and that he has been cheating the company for about a year.  Guerrero then gave examples of how Peterson was cheating the company.  Ex. N, p. 146.

48.  Guerrero told Bell, during that same interview, that Peterson showed him how he leave early and still gets paid, and that just last week he "overheard Peterson talking to Tyler R. Bello about how to leave early."  He gave a further example of how Peterson allegedly coached him how he could move his personal residence and still charge the company as if he were in attendance at a training session at Dallas.

STATEMENT OF MATERIAL FACTS - 12

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

Guerrero said that he told Larry Platte about the scheme, and that Platte couldn't believe it. Ex. N, p. 145-146.

49. During his deposition, Mr. Guerrero admitted that although the email was racist, and a violation of company policy, he wasn't offended by it. Ex. G, p. 96, Guerrero, 72:1-22.

50. According to Ms. Bell, even though there was an obligation to report the email, she would not have allowed Mr. Peterson to retrieve and print the racist email. Ex. C, p. 36, Bell, 84:5-85:12

51. On November 1, 2011, Bell interviewed Frank Christian. Generally, Christian told Bell that he learned about the email from Mr. Peterson (which she already knew). He told her that Peterson complained that the email was wrong and racist, and described its contents. Christian told Bell that Peterson was afraid that management would "sweep it under the rug," and that he would know what to do. Christian told Bell that he told Peterson that he (Christian) would turn it in. Exhibit N, p. 147.

52. Bell asked Christian about Peterson's cheating the company by leaving early. Christian told her "they all do it . . . Peterson, Wargo, Folle, and Guerrero." "Peterson has left no more than half a day early, Wargo and Guerrero have left sometimes for a half a day, and there were times when Folle didn't show up." Ex. N , p. 148.

53. Christian told Bell that Peterson told him that Peterson was offended by the email

STATEMENT OF MATERIAL FACTS - 13

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

and that he knew that Christian knew what to do with it. Ex. C, p. 31, Bell, 60:11-16.

## I. There Exists a Pattern and Practice of Racial Jokes, Slurs and Comments.

54. Mr. Guerrero admitted during his deposition that racist jokes, comments and slurs at the workplace were common place. Ex. G, pp. 91-94, Guerrero, 50:5-63:15.

55. When asked about who told racial jokes at work, Mr. Guerrero testified: "Just about every instructor that's ever worked for us. Just about every employee that I've worked with or every co-worker." Ex. G, p. 93, Guerrero, 61:4-10. When asked for example of a racist joke, he responded: Q: "How do you take a - how do you keep two black guys off a white woman?" A: "Throw them a basketball." "There's a whole bunch out there. That's – that question right there is like asking me if I know the color of my eyes. Of course." *Id.* at p. 94, 62:18-63:13.

56. According to Mr. Christian racial jokes and slurs were commonplace. These jokes included jokes and comments about gay people and women. Ex. F, p. 76, Christian, 27:23-31:8. Folle primarily started the conversation, and others would also participate, including Guerrero. *Id.* at p. 77, 30:13-31:22.

57. According to Guerrero, he didn't report any of the jokes or comments because he wasn't offended. Ex. G, p. 91-92, Guerrero, 53:13-54:17.

58. Guerrero acknowledged that company policy provides that prohibited conduct should be reported, but he didn't believe that he had an obligation to report the racist

STATEMENT OF MATERIAL FACTS - 14

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

email. Ex. G, p. 98,  Guerrero, 79:18-20.

59.  Guerrero acknowledges that he received no discipline for having deleted the email or failing to report it.  Ex. G, p. 98, Guerrero, 80:17-24

60. In January, 2012, Mr. Guerrero received an effective promotion - "To the course director position whenever I have been called."  Guerrero acted as a course director more often since after Peterson left, and is making more money.  Ex. G, p. 89, Guerrero, 44:5-45:20.

61. Ms. Bell admits that she made no effort to determine from Mr. Guerrero whether he was offended by the email, Ex. C, p. 37, Bell, 93:19-25, or whether Folle sent any other prohibited material. Ex. C, p. 35, Bell, 78:18-79:10.  She admits that she made no effort to learn from Mr. Guerrero whether racist comments, slurs and jokes were told by company employees at the workplace. Ex. C, p. 35, Bell, 79:11-80:14.  She admits that she made no effort to learn why Mr. Guerrero deleted the racist email instead of reporting it to Human Resources as required by company policy.  Ex. C, p. 35, Bell 81:7-24.

62. Mr. Young, the H.R. Manager, would take no cognizance of racial comments, jokes or slurs without a formal complaint. Ex. D, p. 49, Young dep. 27:9-28:4, and *Id.* at p. 56, Young, 111:18-112:11

STATEMENT OF MATERIAL FACTS - 15

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

63.    Portions of Guerrero's deposition were read to Mr. Andriessen. Ex. E, p. 68, 88:5-91:24.    He then acknowledged that the behavior described by Guerrero was a violation of company policy and was unacceptable. Ex. E, p. 69, Andriessen, 91:24-92:13.    Andriessen acknowledged that the racial jokes to which Guerrero testified should have subjected him to discipline. Ex. E, pp. 69 - 70, Andriessen, 92:21-94:1. Yet, there was no NSTech investigation concerning the existence of racial jokes, slurs or comments at the workplace. Ex. E, p. 69, Andriessen, 92:14-20.

63a.    Andriessen disagreed that the duty to report prohibited conduct depended upon whether the person observing it found it to be offensive. Ex. E, Andriessen, p. 64, 28:8:15.

## J. Bell Recommends Peterson's Termination for Ulterior Motive.

64.    At the conclusion of her investigation, Ms. Bell recommended that Mr. Peterson be terminated from employment.    The section labeled "Conclusion" exclusively addressed that Peterson's motive for reporting the email was to make his own employment more secure by getting Folle terminated from employment. The issue of reporting the email outside the chain of command is not addressed. Ex. O, p. 159; Ex. I, p. 122, Chisholm,  Vol II, 16:12-17:6. According to Ms. Bell, "Peterson's actions are more despicable than the email." Ex. O. P. 159.

STATEMENT OF MATERIAL FACTS - 16

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington  98104
(206) 447-1560 fax (206) 447-1523

**K. The DARB Board Recommends Peterson's Termination.**

65.  On November 17, 2011, a Discipline Action Review Board ("DARB") meeting was held with operations management and Human Resources management. The purpose of the meeting was to determine whether Mr. Peterson should be terminated from employment. Ex. C, p. 41, Bell, 125:21-126:9. The notes of the DARB Board were prepared by Pam Haynes. Ex. C, p. 39, Bell, 113:12-23; Ex. P, DARB minutes.

66.  Mr. Young was the Chair of the DARB Board. Ex. D, p. 51, Young dep., 93:6-17.

67.  The DARB notes reflect that there were two concerns: 1) "whether Peterson's motive for revealing the email accelerated the departure of his co-worker Richard M. Folle for personal gain; 2) whether Peterson was guilty of "fraud, waste and abuse." The notes reflect that the first concern was investigated by ER, and the second concern was investigated by internal audit, Jay Dickerman. Mr. Dickerman was still working on the Audit. Ex. P, p. 164.

68.  Chisholm stated that Dickerman was still investigating the issue of Peterson leaving early, and needed his laptop computer. When asked if there were other performance issues with Peterson performance, Chisholm stated that "he was not happy that Peterson did not bring things up the chain-of-command and instead he went down the chain." Ex. P, p. 165.

STATEMENT OF MATERIAL FACTS - 17

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

69.  During the DARB it was explained in detail how Peterson allegedly coached Guerrero to leave early and not be caught, and that Larry Platte also had been told about the scheme.  Ex. P, p. 165.

70. It was agreed that Peterson could be transferred pending the investigation, and that would give them time to review his laptop.  "Chisholm agreed that fraud is now a sidebar. . . . Chisholm still wants Peterson terminated, even without the IA [internal audit] findings."  Ex. P , p. 167.

71. It was decided at the DARB that Peterson would be given the opportunity to resign in lieu of termination.  The reason given to Peterson would be "for loss of trust and faith and leave it at that."  The recommendation was unanimous.  "They will wait to hear Younger's approval and then let HR know the path forward."  Ex. P, p. 168.

72.  Dr. Stephen Younger, the President of NSTech, was the final decision maker concerning the decision to terminate Mr. Peterson. Ex. E, p. 65, Andriessen, 36:7-10. Ex. T, p. 203, Defendant's Answers to Plaintiff's Interrogatory No. 3.

73.  Within a day after the DARB meeting, Mr. Andriessen met with Dr. Younger to communicate the DARB recommendation to terminate Plaintiff.  It is not disputed that Mr. Younger did not conduct any independent investigation and relied exclusively upon the oral representations made by Mr. Andriessen.  Ex. E, pp. 67-68, Andriessen, 84:16-87:12.

STATEMENT OF MATERIAL FACTS - 18

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington  98104
(206) 447-1560 fax (206) 447-1523

74. No one at the DARB inquired about whether Folle had sent other prohibited email. Ex. C, p. 41, Bell, 122:20-24. No one asked why Guerrero didn't report the email or why he deleted it. Ex. C, p. 41, Bell, 122:25-123:5; Ex. I, p. 123, Chisholm Vol II., 19:10-12. No one at the DARB inquired about whether Guerrero, Folle or other employees had been involved with other racial comments and slurs. Ex. C, p. 41, Bell, 123:6-23; Ex. I, p. 123, Chisholm, Vol, II. 19:13-21:3; Ex. D, pp. 53-54, Young dep., 101:24-102:12; Ex. E, p. 67, Andriessen, 83:16-84:15.

**L. DARB Recommends Termination Peterson Because He Reported the Racist Email Outside the Chain of Command. Fraud, Waste, and Abuse Not Relied Upon.**

75. The Defendant admits that the reason for Plaintiff's termination was his "involvement in the recent resignation of a former Course Director, Richard. M. Folle." Ex. T, p. 203, Defendant's Answers to Plaintiff's Interrogatory No. 3.

76. When asked about allegations that Plaintiff defrauded or submitted false expense vouchers, the Defendants objected on the grounds that those allegations "were not the basis for Plaintiff's termination." Ex.T; p. 204, Def. Objection to Interrog. No. 5.

77. The Defendant continues to insist that the allegation of financial misconduct was not a reason for Mr. Peterson's termination from employment - "that was not part of the DARB . . . and the fraud and abuse issue had absolutely nothing to do this." Ex. C, p. 41, Bell, 124:7-22; Ex. I, p. 125, Chisholm, Vol. II. 27:15-17.

STATEMENT OF MATERIAL FACTS - 19

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

78.  The reason for the recommendation to terminate was because Peterson reported the racist email outside the chain of command, i.e., he reported it to Frank Christian instead of Human Resources.  Mr. Chisholm, Ms. Bell, Mr. Young, and Mr. Andriessen all testified that, regardless of his motivation, Mr. Peterson would not have been terminated from employment if he had given racist email directly to Ms. Bell instead of giving to Mr. Christian to report instead.  Ex. C, p. 39, Bell, 112:18-21; Ex. I, pp. 125-126, Chisholm, ,Vol II. 28:20-25; 29:6-30:24; Ex. B, p. 21, Whitt Dep., 63:2-7; Ex. D, p. 55, Young, 108:4-19; Ex. E, p. 66, Andriessen, 80:14-17.

79.  The subjective reason given for Peterson's termination was the loss of confidence.  Ex. P., p. 167.  According to Chisholm, the allegation of fraud did not contribute to a loss of confidence in Peterson.  Ex. I, p. 125, Chisholm, Vol. II, 28:9-11.

**M.  Reporting the Email Outside the Chain of Command Did Not Interfere with Peterson's Ability to Do His Job.**

80.  Peterson was a good course director.  Ex. I, p. 120, Chisholm, 60:23-24; Ex. B, p. 19, Whitt, 38:24-39:7.

81.  Mr. Chisholm, Ms. Bell, Mr. Young, and Mr. Andriessen all testified that reporting the email outside the chain of command did not adversely effect Mr. Peterson's ability to do his job.  According to Andriessen, "if it did interfere with his

STATEMENT OF MATERIAL FACTS - 20

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

ability to do his job, he has no knowledge of it." Ex. E, p. 67, Andriessen, 82:9-17.

Andriessen is aware of no complaints about Peterson from any source, and was not aware of any instance where it was alleged that a course wasn't properly conducted, or that he was disruptive in any way to the work place. Ex. E, p. 67, Andriessen, 82:18-83:15. Ms. Bell testified as follows: "Q. How did the fact that Mr. Peterson gave to Mr. Christian the e-mail so it could be given to ER, how did that fact impact Mr. Peterson's ability to do his job? A. I don't know if it did impact his ability to do his job." Ex. C, p. 41, Bell, 124:23-125:3. *See also* Ex. I, pp. 124-125, Chisholm, Vol II, 24:14-28:19; Ex. D, pp. 55-56, Young, 109:11-110:24.

82. Chisholm testified that reporting the email outside the chain of command caused a loss of confidence and trust, and he could think of no other reason that prevented Peterson from doing his job. Ex. I, Chisholm, pp. 124-125, Vol. II, 24:1-26:3; 28:15-19.

83. There were no complaints about the ability of Mr. Peterson's job performance by co-workers, vendors, trainees or anyone else. Ex. B, p. 19, Whitt dep. 38:19-39:7. There is no evidence that Mr. Peterson was disruptive in the workplace in any way. Ex. E, p. 67, Andriessen, 82:9-83:15.

STATEMENT OF MATERIAL FACTS - 21

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

**N. Dickerman's Investigation. No Evidence of Fraud Waste and Abuse by Peterson.**

84. Jay Dickerman acknowledges that he learned of the investigation from Fannie Bell. Ex. H, p. 104, Dickerman, 29:16-25. Ex. S is a document that Bell gave him when they first met to discuss this assignment, *Id.* at p. 105, 30:22-31:6, on November 1, 20, p. 106, Dickerman, 35:4-24. His handwritten annotations and highlighting were made on November 1, 2011. *Id.* at p. 107, 39:8-10; *See* Ex. S.

85. Dickerman didn't interview Guerrero until November 16, 2011 because it "is not the only work I do - I did it when I had time". Ex. H, p. 108, Dickerman, 46:13-19.

86. After Dickerman interviewed Guerrero, he determined that he couldn't prove fraud against Peterson. Ex.H, p. 108, Dickerman, 47:24-48:2. There was no evidence of fraud, waste and abuse by Peterson after Dickerman completed his investigation. *Id.* at p. 109, 52:17-20.

87. Dickerman found no support for the allegation that Peterson was leaving remote training sites early and still charging his travel time and time as if he stayed for the last day of training. Ex. H, p. 110, Dickerman, 54:11-17.

88. Dickerman found the allegation that Peterson returned a rental car early and then altered the receipt to be not credible. Ex. H, p. 110, Dickerman, 54:18-58:2.

89. Based upon his investigation, Dickerman found Guerrero's allegations NOT

STATEMENT OF MATERIAL FACTS - 22

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

CREDIBLE. Ex. H, p. 111, Dickerman, 61:3-6; p. 112, 76:25-77:11.

90. Dickerman acknowledges that if Peterson had still been employed, he would have interviewed him, and that would have been a critical part of the investigation. Ex. H, p. 113, Dickerman, 78:17-79:10.

91. Dickerman acknowledges that he can not recall having ever done an investigation concerning employee fraud waste and abuse without interviewing the employee alleged to have done wrongdoing. Ex. H, p. 113, Dickerman, 79:11-80:2.

92. Dickerman acknowledges that Peterson was never interviewed. He states, however, that the failure to interview Peterson was "not a significant limitation" of the investigation "because the results of the investigation had no impact on Mr. Peterson" because he had already been terminated. Ex. H, p. 114, Dickerman, 82:12-83:2.

93. Dickerman acknowledges that if Peterson still had been an employee and the results of the investigation would determine whether or not he would be terminated, "then it [lack of Peterson interview] would be a very significant limitation." Ex. H p. 114, Dickerman, 83:3-8.

94. Dickerman's report was not completed until January 24, 2011. Ex. H, Dickerman, p. 111a-111-b, 65:16-66:5.

STATEMENT OF MATERIAL FACTS - 23

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

Respectfully submitted this ____ day of February, 2013.


Jeffrey Needle, WSBA #6346
Attorney for Plaintiff

STATEMENT OF MATERIAL FACTS - 24

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington 98104
(206) 447-1560 fax (206) 447-1523

Declaration of Service

I hereby certify that on February 19, 2013, I presented the foregoing Plaintiff's Statement of Material Facts in Support of Motion for Summary Judgment to the Clerk of the Court through the CM/ECF system, for filing and uploading to the CM/ECF system, which will serve and send notification of such filing to the following:

James Kalomon
Shamus. T. O'Doherty
Paine Hamblen LLP
717 W Sprague Ave Ste 1200
Spokane, WA  99201-3505

DATED IN SEATTLE, WASHINGTON THIS 19th day of February, 2013.

Kathleen Kindberg

STATEMENT OF MATERIAL FACTS,
Declaration of Service - 25

JEFFREY L. NEEDLE
Attorney at Law
200 Maynard Building
119 First Avenue South
Seattle, Washington  98104
(206) 447-1560 fax (206) 447-1523